TIFFANY (NJ) LLC and Tiffany
and Company, Plaintiffs,

v.

QI ANDREW, Gu Gong, Sliver Deng and
Kent Deng, all d/b/a Tiffanystores.org,
Fashion Style and Storesorg; ABC Com-
panies; and John Does, Defendants.

No. 10 Civ. 9471 (WHP)(HBP).

United States District Court,
S.D. New York.

July 25, 2011.

Robert L. Weigel, Anne Maureen Coyle, Howard Sean Hogan, Jennifer Colgan Halter, Gibson, Dunn & Crutcher LLP, New York, NY, for Plaintiffs.

## OPINION AND ORDER

PITMAN, United States Magistrate Judge:

### I. *Introduction*

Plaintiffs move for an Order compelling non-parties Bank of China ("BOC"), Industrial and Commercial Bank of China ("ICBC") and China Merchants Bank ("CMB") (collectively the "Banks") to produce documents

pursuant to a subpoena duces tecum that was served upon them in January 2011. The Banks oppose plaintiffs' motion.

For the reasons set forth below, plaintiffs' motion to compel is denied without prejudice to renewal.

## II. *Facts*

Plaintiffs Tiffany (NJ) LLC and Tiffany and Company are the well-known, high-end manufacturers of jewelry and other products which hold "various federally registered and common law trademarks used to identify the high quality goods merchandised or manufactured by Tiffany" (Complaint, dated Dec. 20, 2010 (Docket Item 1), ¶ 1). Plaintiffs allege that defendants sold counterfeit Tiffany products through several websites hosted in the United States. Plaintiffs claim that defendants accepted payment in U.S. dollars and used PayPal, Inc. ("PayPal") to process customers' credit card transactions, then transferred the profits to accounts held by the Banks (Memorandum of Law in Support of Plaintiffs' Motion to Compel, dated May 3, 2011 (Docket Item 21), ("Pl.'s Mem. in Supp.") at 1). PayPal was the sole method of payment for these goods (Pl's Mem. in Supp. at 4; Declaration of Robert Weigel, dated May 3, 2011 (Docket Item 22), ("Weigel Decl.") ¶¶ 4, 8, 11–13). Defendants have not responded to the complaint, nor have they responded to the Court's order requiring them to produce documents related to their counterfeiting operation (Pl.'s Mem. in Supp. at 3).

The Honorable William H. Pauley, III, United States District Judge, entered a Preliminary Injunction on January 3, 2011 (Preliminary Injunction, dated January 3, 2011 (Docket Item 7), (the "PI Order")). The PI Order directed that

> Plaintiffs' motion for continued expedited discovery from financial institutions is granted, and that any banks ... or other companies or agencies that engage in the transfer of real or personal property, who receive actual notice of this order by personal service or otherwise, shall provide to Plaintiffs all records in their possession, custody, or control, concerning the assets and financial transactions of Defendants or

any other entities acting in concert or participation with Defendants, including but not limited to records concerning the following: ... any and all Bank of China accounts in the name of or associated with Defendants ... any and all Industrial and Commercial Bank of China accounts in the name of or associated with Defendants

(PI Order at 8). The PI Order further directed that these institutions could "apply to this Court for relief from the terms of this paragraph within seven (7) days of service of this order" (PI Order at 9).

On January 5, 2011, plaintiffs served the New York branches of BOC and ICBC ("BOCNY" and "ICBCNY" respectively) with copies of the PI Order, and on January 7, 2011, plaintiffs served these branches with subpoenas pursuant to Federal Rule of Civil Procedure 45 (Declaration of Lanier Saperstein, dated May 17, 2011 (Docket Item 27), ("Saperstein Decl.") ¶¶ 5–6) seeking the following documents: (1) communications concerning defendants or defendants' accounts; (2) documents containing contact information associated with defendants' accounts; (3) documents relating to any and all credit card transactions processed in connection with purchases from defendants or defendants' websites; (4) documents concerning any open or closed checking, savings, or money market accounts, and certificates of deposit held in the name of any of the defendants, including bank statements; (5) documents concerning any open or closed loans or mortgages relating to any of the defendants; (6) wire transfer documents and files relating to any of the defendants, including documents reflecting the source of funds for wires into defendants' accounts and (7) documents relating to Currency Transaction Reports and Suspicious Activity Reports concerning any of the defendants (*see* Pl.'s Mem. in Supp. at 4–5; Subpoenas, attached to Weigel Decl. as Exs. 7, 9, 11).

On January 7, 2011, BOCNY informed plaintiffs that it had searched its computer system, but did not find any accounts held in the names of defendants. BOCNY requested additional information to distinguish common Chinese names, as well as the full account number of the abbreviated account

number set forth in the PI Order. It agreed to search for that account, as well as any responsive wire transfer documents for which BOCNY acted as an intermediary. BOCNY also asserted that it "ha[d] no access to or control over any customer accounts or any customer account information located outside the United States" (Letter of Lanier Saperstein to Anne Coyle, dated Jan. 7, 2011 and attached to Saperstein Decl. as Ex. D).

On January 21, 2011, BOCNY informed plaintiffs that after a search, it had not located any responsive wire transfers, though it claimed it needed additional identifying information to identify responsive wire transfers for "Ma Li" because it was too common a name. BOCNY also offered to assist plaintiffs in preparing and submitting a discovery request to Chinese authorities pursuant to the Hague Convention, a proposal to which plaintiffs did not agree (Letter of Lanier Saperstein to Jennifer Halter, dated Jan. 21, 2011 and attached to Saperstein Decl. as Ex. E).

On January 24, 2011, BOCNY served objections and responses to the subpoena, and stated that it did not have "possession, custody or control" of documents at any branch or office outside of the United States. It also objected to producing any information to the extent such production would violate domestic or foreign law (BOCNY's Objections and Responses to Plaintiffs' Rule 45 Subpoena, dated Jan. 24, 2011 and attached to Saperstein Decl. as Ex. F). On February 24, 2011, BOCNY confirmed that it had no accounts matching the numbers provided by plaintiffs, nor did it have any wire transfer documents to or from those accounts during the relevant time period (Letter of Lanier Saperstein to Jennifer Halter, dated Feb. 24, 2011 and attached to Saperstein Decl. as Ex. G).

Similarly, on January 7, 2011, ICBCNY informed plaintiffs that it held no accounts relating to any of the defendants (Letter of Ying Wang to Anne Coyle, dated Jan. 7, 2011 and attached to Saperstein Decl. as Ex. H). ICBCNY later informed plaintiffs that it had no accounts matching the numbers provided by plaintiff, but proposed to assist plaintiffs in preparing a request pursuant to the Hague Convention (Letter of Lanier Saper-

stein to Jennifer Halter, dated Feb. 24, 2011 and attached to Saperstein Decl. as Ex. G).

On January 24, 2011, ICBCNY served its formal objections and responses to the subpoena and stated that it did not have "possession, custody or control" of documents at any branch or office outside of the United States, and objected to producing any information to the extent such production would violate domestic or foreign law (ICBCNY Objections and Responses, dated Jan. 24, 2011 and attached to Saperstein Decl. as Ex. I).

On January 26, 2011, plaintiffs served a copy of the PI Order and a Rule 45 Subpoena on CMB's New York branch ("CMBNY") seeking the same documents as those requested from BOC and ICBC (PI Order and Subpoena, dated Jan. 26, 2011 and attached to Weigel Dec. as Ex. 11). In a letter dated January 28, 2011, CMBNY's counsel informed plaintiffs that it "ha[d] no accounts or assets for the defendants listed in the PI [Order] and identified in your letter" and noted that CMBNY would serve "objections and responses to the Subpoena within the time called for in the Subpoena" (Letter of Dwight Healy to Jennifer Halter, dated Jan. 28, 2011 and attached to Declaration of Dwight Healy, dated May 17, 2011 (Docket Item 24), ("Healy Decl.") as Ex. A). CMBNY then objected to the production of any documents not in the custody and control of CMBNY, noting that it did not have control over documents located in any other office of CMB. CMBNY also objected to producing documents that "would violate any applicable domestic or foreign law, including the banking, commercial and criminal laws of the People's Republic of China" (CMB's Objections and Responses, dated Jan. 24, 2011 and attached to Weigel Decl. as Ex. 14).

Plaintiffs now move to compel the Banks to provide all documents called for by the subpoenas and the PI Order (Docket Item 20). The Banks oppose this motion arguing: (1) the Banks do not have custody or control of documents located in China and (2) plaintiffs' motion should be denied in accordance with notions of comity.

III. *Analysis*

A. *Scope of Subpoena Served Pursuant to Rule 45*[1]

1. *Applicable Law*

Rule 45 of the Federal Rules of Civil Procedure states that a subpoena may command a non-party to produce documents that are in its "possession, custody, or control." Fed. R.Civ.P. 45; *see also Linde v. Arab Bank, PLC,* 262 F.R.D. 136, 141 (E.D.N.Y.2009).

"Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand." *Searock v. Stripling,* 736 F.2d 650, 653 (11th Cir.1984). "Control" may also be found where an entity has "access to" and the "ability to obtain the documents." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 144 (S.D.N.Y.1997); *see also, e.g., In re Ski Train Fire of November 11, 2000 Kaprun Austria,* 2006 WL 1328259, *5 (S.D.N.Y. 2006) (same); *Addamax Corp. v. Open Software Found., Inc.,* 148 F.R.D. 462, 467 (D.Mass.1993) (same). The party seeking to compel a subsidiary to produce the documents of its foreign parent has the burden of showing that the documents are within the local subsidiary's control. *See, e.g., State of New York v. Nat'l R.R. Passenger Corp.,* 233 F.R.D. 259 (N.D.N.Y. 2006). "Access" and "ability to obtain documents" have been found where "documents ordinarily flow freely between" parent and subsidiary. *Hunter Douglas, Inc. v. Comfortex Corp.,* No. CIV. A. M8–85, 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999).

*Linde v. Arab Bank, PLC, supra,* 262 F.R.D. at 141 (footnote omitted). *See also Shcherbakovskiy v. Da Capo Al Fine, Ltd.,* 490 F.3d 130, 138 (2d Cir.2007) (documents are within a party's possession, custody or control when it has the practical ability to obtain them); *Vacco v. Harrah's Operating Co. Inc.,* No. 1:07–CV–0663 (TJM/DEP), 2008 WL 4793719 at *9 (N.D.N.Y. Oct. 29, 2008) ("The touchstone of control, which has been variously defined by the courts, is the ability, whether through the exercise of a legal right or authority or through other means, to obtain the requested documents."); *see George Hantscho Co. v. Miehle–Goss–Dexter, Inc.,* 33 F.R.D. 332, 334–35 (S.D.N.Y.1963) (Palmieri, D.J.).

■■■ Regardless of the witness' legal relationship to a document, for the purposes of a Rule 45 subpoena, a document is within a witness's "possession, custody, or control" if the witness has the practical ability to obtain the document. *Babaev v. Grossman,* No. CV03–5076 (DLI)(WDW), 2008 WL 4185703 at *3 (E.D.N.Y. Sept. 8, 2008) ("Documents are under a party's control when it has the right, authority or practical ability to obtain them from a non-party."); *In re NTL, Inc. Sec. Litig.,* 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (Peck, M.J.) ("Under Rule 34, control does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action.") (internal quotation marks and citations omitted), *aff'd sub nom., Gordon Partners v. Blumenthal,* 02 Civ. 7377(LAK), 2007 WL 1518632 (S.D.N.Y. May 17, 2007) (Lewis, D.J.); *see In re Zyprexa Prods. Liab. Litig.,* 254 F.R.D. 50, 58 (E.D.N.Y.2008), *aff'd,* 04–MD–1596, 2008 WL 4682311 (E.D.N.Y. Oct. 21, 2008); *Bank of New York v. Meridien BIAO Bank Tanzania, Ltd.,* 171 F.R.D. 135, 146–47 (S.D.N.Y. 1997) (Francis, M.J.); *George Hantscho Co. v. Miehle–Goss–Dexter, Inc., supra,* 33 F.R.D. at 334–35.[2] If the party subpoenaed

---

1. The New York branches of the Banks are branches of the same corporate entities as their counterparts in China. Accordingly, this Court has personal jurisdiction over the Banks. The New York branches are not affiliates or subsidiaries. *See Milliken & Co. v. Bank of China,* 758 F.Supp.2d 238, 247–48 (S.D.N.Y.2010) (McKenna, D.J., adopting Report & Recommendation of Francis, M.J.); *Dietrich v. Bauer,* 95 Civ. 7051(RWS), 2000 WL 1171132 at *4 (S.D.N.Y. Aug. 16, 2000) (Sweet, D.J.). The Banks do not contest this Court's jurisdiction.

2. Although some of the cases cited herein involve requests for the production of documents served pursuant to Fed.R.Civ.P. 34 rather than a Rule 45 subpoena, the difference is immaterial. "The scope of the two rules is coextensive . . . at least

has the practical ability to obtain the documents, the actual physical location of the documents—even if overseas—is immaterial. *Matter of Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir.1983); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 180 (S.D.N.Y.2006) (Conner, D.J.); *Cooper Indus., Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 (S.D.N.Y.1984) (Edelstein, D.J.). However, "[l]egal and practical inability to obtain the requested documents from the non-party, including by reason of foreign law, may place the documents beyond the control of the party who has been served with the Rule 34 request." *Cohen v. Horowitz*, 07 Civ. 5834(PKC), 2008 WL 2332338 at *2 (S.D.N.Y. June 4, 2008) (Castel, D.J.), *citing Shcherbakovskiy v. Da Capo Al Fine, Ltd., supra*, 490 F.3d at 138.

▮ The burden of demonstrating that the party from whom discovery is sought has the practical ability to obtain the documents at issue lies with the party seeking discovery. *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 n. 7 (S.D.N.Y.1992) (Dolinger, M.J.) ("In the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion."); *accord Honda Lease Trust v. Middlesex Mut. Assur. Co.*, No. 3:05CV1426 (RNC), 2008 WL 3285242 at *2 (D.Conn. Aug. 7, 2008); *SEC v. Credit Bancorp, Ltd., supra*, 194 F.R.D. at 472; *In re Lozano*, 392 B.R. 48, 54 (Bnkr.S.D.N.Y.2008) (Glenn, B.J.).

▮ "[A] corporation is presumed to have custody and control of its own records ordinarily required in the course of business, and the burden of proving otherwise is on the corporation" (Pl.'s Mem. in Supp. at 7, *citing Hunter Douglas, Inc. v. Comfortex Corp.*, CIV. A. M8–85 (WHP), 1999 WL 14007 at *3 n. 6 (S.D.N.Y. Jan. 11, 1999) (Pauley, D.J.); *Cooper Indus. Inc. v. British Aerospace, Inc., supra*, 102 F.R.D. at 920 n. 2; *In re Equitable Plan Co.*, 185 F.Supp. 57, 60–61 (S.D.N.Y.1960) (Herlands, D.J.) (requiring foreign banks to respond to document sub-

with respect to documentary discovery." *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 n. 4 (S.D.N.Y.2000) (Sweet, D.J.), *citing First Am.*

poenas served on New York branches)). In this case, plaintiffs' subpoenas were directed to the corporate entities of BOC, ICBC and CMB—entities which actually have branch offices (not subsidiaries or affiliates) in New York.

### 2. *Location of the Documents*

The New York branch offices all claim that the documents at issue are located in their China branches, and they assert that the New York and China branches do not share computer systems that can access the information sought and do not otherwise exchange the type of information requested (Declaration of Richard Pagnotta, dated May 17, 2011 (Docket Item 26), ("Pagnotta Decl.") ¶¶ 2–3; Declaration of John Beauchemin, dated May 17, 2011 (Docket Item 28), ("Beauchemin Decl.") ¶¶ 3–6; Declaration of Xintao Luo, dated May 17, 2011 (Docket Item 30), ("Luo Decl.") ¶¶ 3–6). Therefore, the Banks claim that the documents are not in the New York branches' custody and control and cannot be produced. They also claim that their personnel "do not have the authority to direct personnel at the head offices or at Chinese branches to disclose customer account information" and lack the "ability" or "legal right" to obtain the information plaintiffs request (Memorandum of Law in Opposition to Plaintiffs' Motion to Compel the Production of Documents from Non-parties Bank of China and Industrial and Commercial Bank of China, Ltd., dated May 17, 2011 (Docket Item 31), ("BOC/ICBC Mem. in Supp.") at 12–13, *citing Linde v. Arab Bank, PLC, supra*, 262 F.R.D. at 141 *and Zenith Electronics v. Vizio*, Misc. No. M8–85, 2009 WL 3094889, at *2 (S.D.N.Y. Sept. 25, 2009) (Pauley, D.J.)). The Banks further note that although their foreign customers can access their accounts electronically in the United States, the United States branches of the Banks cannot themselves access this information (*see* Pagnotta Decl. ¶ 4; Beauchemin Decl. ¶ 4).

*Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 21 (2d Cir.1998).

Plaintiffs claim that because "[n]one of the Banks' New York branches are separately incorporated from the branches that operate overseas, including the branches in China," the Banks should be deemed to have custody and control over the documents at issue (Pl.'s Mem. in Supp. at 5).

### 3. The Banks have Custody and Control of the Documents

As noted by plaintiffs, "a corporation is presumed to have custody and control of its own records ordinarily required in the course of business, and the burden of proving otherwise is on the corporation" (Pl.'s Mem. in Supp. at 7, *citing Hunter Douglas, Inc. v. Comfortex Corp.*, *supra*, 1999 WL 14007 at *3 n. 6). "Clear proof of lack of possession and control is necessary to rebut the presumption." *First Nat'l v. IRS*, 271 F.2d 616, 618 (2d Cir.1959). In this case, plaintiffs' subpoenas are directed to the corporate entities of BOC, ICBC and CMB. Though they were served on their branch offices in New York, the subpoenas are directed to these corporate entities in their entirety. The Banks do not dispute that their New York and China branches are part of the same corporate entity. The necessary inquiry, therefore, is whether the Banks have overcome the presumption that they control the documents within their China branches.

This case is analogous to *Ssangyong Corp. v. Vida Shoes Int'l, Inc.*, 03 Civ. 5014(KMW)(DFE), 2004 WL 1125659 (S.D.N.Y. May 20, 2004) (Eaton, M.J.), in which the New York branch of a bank headquartered in Hong Kong claimed it did not have custody and control over the documents in the foreign branch. The Court held that where the foreign bank and its New York branch were not "separate entities," and account holders were aware that documents could be sent outside the foreign branch, the New York branch had custody and control of the documents regardless of their location abroad. *Ssangyong Corp. v. Vida Shoes Int'l, Inc.*, *supra*, 2004 WL 1125659 at *4–5. Although the Banks are correct that an analysis of the "reality of whether the entity from which discovery is sought has actual control over the records" has been used to determine the reach of a subpoena or document request (Memorandum of Law of Third Party China Merchants Bank in Opposition to the Plaintiffs' Motion to Compel, dated May 17, 2011 (Docket Item 23), ("CMB Mem. in Supp.") at 7), this analysis is usually warranted only "[w]here there are *two* entities." *Ssangyong Corp. v. Vida Shoes Int'l, Inc.*, *supra*, 2004 WL 1125659 at *4 (emphasis added).

The Banks cite several cases in which motions to compel discovery were denied because one branch of an entity was found to lack control over the documents of another (CMB Mem. in Supp. at 7, 10; BOC/ICBC Mem. in Supp. at 13 n. 3, *citing New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 268 (N.D.N.Y.2006); *Zenith Electronics v. Vizio*, *supra*, 2009 WL 3094889 at *2; *Linde v. Arab Bank, PLC*, *supra*, 262 F.R.D. at 142–45). However, these cases are not instructive because they give no insight into the fact-specific question of whether the Banks in this case, the New York branches of which are not legally separate entities, have overcome the presumption that they have control over their own documents.

The Banks also discuss several cases in which a corporate branch was either found to have control over documents in another branch, or did not argue otherwise (CMB Mem. in Supp. at 8–10; BOC/ICBC Mem. in Supp. at 13 n. 13, *citing First Nat'l v. IRS*, *supra*, 271 F.2d at 618; *United States v. First Nat'l City Bank*, 396 F.2d 897, 898 n. 2 [3] (2d Cir.1968); *Ings v. Ferguson*, 282 F.2d 149, 151–52 (2d Cir.1960); *In re Equitable Plan Co.*, *supra*, 185 F.Supp. at 59). Again, these cases are not helpful because they do nothing to answer the factual question of whether the Banks have custody and control of the documents requested in this case.

The Banks attempt to overcome the presumption that they have custody and control over the documents by asserting that their New York and China branches have separate computer systems, and that their New York personnel cannot compel the China headquarters to produce account information. These facts are of no moment, however, be-

---

**3.**   CMB cites footnote 3, but quotes footnote 2.

cause the subpoena is directed to the Banks as a whole, not solely the New York branches. The Banks do not argue that BOC, ICBC and CMB lack control over documents in China. Accordingly, I find that the documents requested are, in fact, in the Banks' custody and control.

## B. *Existence of a True Conflict*

In addition to arguing that they do not have possession and control of the documents, the Banks resist production on the ground that production is prohibited by Chinese law. They rely on the following provisions of Chinese law, among others, in asserting this contention:

- Commercial Bank Law Article 6 which provides that commercial banks shall safeguard the legal rights and interests of depositors against the encroachment of any entity or individual

- Article 24 of the Corporate Deposit Regulations which provides that a financial institution shall keep secret the deposits of corporate depositors

- Article 28 of the Corporate Deposit Regulations which provides that savings institutions, defined to include banks, and their personnel shall keep secret depositors' savings and related information. A commercial bank that discloses information about the deposit of a corporate depositor in violation of the provisions of Article 24, or looks into, freezes or debits the funds of a corporate depositor on behalf of others in violation of Chinese law, can be punished according to Article 73 of the Law of the People's Republic of China on Commercial Banks

- The Provisions on the Administration of Financial Institutions' Assistance in the Inquiry into, Freeze or Deduction of Deposits which provide the procedure for inquiring into, freezing, or debiting banks' accounts. At least two conditions must be met before such an action can take place: first, the request for inquiry into, freezing or debiting funds from the deposit account must be from an authorized governmental entity; second, the governmental entity must present the bank with a document called "a notice on the assistance with the inquiry into, or freeze or deduction of deposits" issued by the governmental entity at the appropriate level

- Article 73 of the Commercial Bank Law which provides that if a commercial bank illegally discloses information about, freezes, or debits an account, it shall pay interest for the deferred payment and the banking regulatory organ of the State Council shall order the commercial bank to take corrective action and impose on it a fine of not less than RMB 50,000 Yuan and not more than RMB 500,000 Yuan. The bank may also be subject to civil liability from the depositors

- Article 78 of the Commercial Bank Law which provides that if a commercial bank violates Chinese law as described in Article 73, its directors, senior management personnel and other persons who are held directly responsible shall be given disciplinary punishment, which may include a note in the individual's human resources file, demotion or dismissal

- Article 253(A) of China's Criminal Law which pertains to staff members of particular institutions, including state and financial entities. If these staff members sell or illegally provide personal information of citizens to others in violation of Chinese law, which they obtained during the entity's performance of duties or provision of services, those staff members shall, if the circumstances are serious, be sentenced to a fixed term of imprisonment of not more than three years, additional criminal detention and/or a fine. Where any entity commits such a crime, it shall be fined, and the individuals in charge as well as any other individual who may be directly liable for the crime, shall be punished in accordance with the applicable law. These restrictions apply in the absence of customer consent

(*see* Declaration of Zhipan Wu, dated May 17, 2011 (Docket Item 25), ("Wu Decl.") ¶¶ 9–33; Translation, attached to Wu Decl. as Exs. B–1, B–2, B–3, B–4, B–6; Declaration of James Feinerman, dated May 17, 2011 (Docket Item 29), ("Feinerman Decl.") ¶¶ 21–53).

■ Where a party from whom discovery is sought asserts foreign law as a bar to production, courts perform a comity analysis to determine the weight to be given to the foreign jurisdiction's law. *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1049 (2d Cir. 1996); *see also Strauss v. Credit Lyonnais, S.A.*, No. CV–06–0702 (CPS), 2006 WL 2862704 at *18 (E.D.N.Y. Oct. 5, 2006); *Container Leasing Int'l, LLC v. Navicon, S.A.*, No. CIV303V00101 (AWT), 2006 WL 861012 at *6 (D.Conn. Mar. 31, 2006); *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y.1993) (Katz, M.J.). Plaintiffs do not dispute that there is a true conflict between United States and Chinese law on this issue and that resort to a comity analysis is appropriate.

### C. *Comity Analysis*[4]

■ In determining whether to order discovery of foreign documents and information, courts in this Circuit follow the Restatement (Third) of Foreign Relations Law § 442(1)(c) and consider: (1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of retrieving the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located. *See Gucci America, Inc. v. Curveal Fashion*, 09 Civ. 8459(RJS)(THK), 2010 WL 808639 at *2 (S.D.N.Y. Mar. 8, 2010) (Katz, M.J.); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y.1987). "In addition, courts in the Second Circuit may also consider the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery." *Gucci America, Inc. v. Curveal Fashion, supra,* 2010 WL 808639 at *2 (internal quotations omitted).

### 1. *Importance of the Information*

■ Plaintiffs claim that discovery of defendants' operations and finances from the Banks is vital to the litigation because defendants have not appeared in the action and it appears that defendants themselves will not be providing any discovery (Pl.'s Mem. in Supp. at 11). Plaintiffs maintain that the Banks' records include information regarding "'the sources and uses of the funds'" from the counterfeiting operation, and that without this information, plaintiffs will not be able to determine the size and scope of defendants' illegal enterprise (Pl.'s Mem. in Supp. at 11–12; Circular of the People's Bank of China, dated Jan. 1, 2005 and attached to Weigel Decl. as Ex. 23). The Banks argue that plaintiffs have already obtained this information from GoDaddy.com, the website provider, and PayPal, and, therefore, it is not crucial that plaintiffs obtain it from the Banks. The Banks claim that because plaintiffs have established that PayPal was the sole method of payment for the counterfeit goods sold on defendants' websites, the Banks have no additional information. In reply, plaintiffs note that PayPal records do not identify the recipients of the funds or where the funds were transferred following their deposit (BOC/ICBC Mem. in Supp. at 14–15; CMB Mem. in Supp. at 13; Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Compel the Production of Documents from Third–Parties, dated May 24, 2011 (Docket Item 32), ("Pl.'s Reply Mem.") at 10–11).

Plaintiffs are correct in this regard. Because the Banks' records could potentially reveal the identities of those involved in the counterfeiting operation, they are important to plaintiffs' claims. Moreover, account transaction records could allow plaintiffs to discover if the funds from the accounts were

---

4. Comity is defined,
> in the legal sense, [a]s neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

used to create counterfeit goods, thereby identifying manufacturers, or to compensate others involved in the operation, thereby identifying other defendants. This information cannot now be obtained from the websites' records or from defendants, making its production by the Banks all the more important.

Both plaintiffs and the Banks assert several additional arguments concerning the importance of the information, including whether plaintiffs may obtain discovery concerning enforcement of a judgment at this time. Because these documents are relevant to the litigation at this, the pre-judgment stage, their importance does not depend on whether they would be discoverable in connection with the enforcement of any judgment that may be entered in this matter. Likewise, it does not matter at this stage whether the extraterritorial assets could be restrained by the PI Order or some other mechanism. Because plaintiffs have demonstrated that the information they seek from the Banks is important for pursuing their claims at the present stage of the litigation, this factor weighs in favor of plaintiffs.

### 2. The Requests' Specificity

The Banks next argue that plaintiffs' subpoenas are overly broad, but do not single out any particular request[5] to demonstrate overbreadth (BOC/ICBC Mem. in Supp. at 16; CMB Mem. in Supp. at 16). In fact, plaintiffs' subpoenas here are virtually identical to that at issue in *Curveal*, which was found to be narrowly tailored (*see* Curveal Subpoena, dated Nov. 5, 2009 and attached to Declaration of Jennifer Halter, dated May 24, 2011 (Docket Item 33), ("Halter Decl.") as Ex. 5). *Gucci America, Inc. v. Curveal Fashion, supra*, 2010 WL 808639 at *3. However, CMB argues that, unlike in *Curveal*, plaintiffs' current requests are not targeted at specific accounts (CMB Mem. in Supp. at 16; BOC Subpoena, dated Jan. 7, 2011 and

attached to Weigel Decl. as Ex. 7; ICBC Subpoena, dated Jan. 7, 2011 and attached to Weigel Decl. as Ex. 9; CMB Subpoena, dated Jan. 26, 2011 and attached to Weigel Decl. as Ex. 11). To the contrary, these requests, like those in *Curveal*, are directed to the accounts of the defendants. In addition, plaintiffs provided account numbers for some defendants (*see* Emails of Jennifer Colgan, attached to Weigel Decl. as Ex. 10). Certainly, these requests are sufficiently specific. This prong, then, also weighs in favor of plaintiffs.

### 3. Whether Information Originated in the United States

Plaintiffs claim that because the funds in the relevant accounts originated in the United States, and because the Banks' customers can access their foreign accounts in the United States, the information at issue cannot be said to originate solely in China (Pl.'s Mem. in Supp. at 14–15). The Banks do not deny these facts, but correctly note that the actual information that plaintiffs seek is located abroad and cannot be accessed by personnel at BOCNY, ICBCNY or CMBNY (BOC/ICBC Mem. in Supp. at 16–17; CMB Mem. in Supp. at 16).[6] The overseas location of this information weighs in favor of the Banks. *Linde v. Arab Bank, PLC, supra*, 262 F.R.D. at 150; *Gucci America, Inc. v. Curveal Fashion, supra*, 2010 WL 808639 at *3.

### 4. Alternative Means for Securing the Information

All parties acknowledge that a request for discovery by way of the Hague Convention is potentially an alternative means of securing the information at issue. Plaintiffs have asserted five reasons why such a request would be futile (Pl.'s Mem. in Supp. at 15–19). Generally, they argue that China's Hague Convention procedures "do not offer a meaningful avenue to discovery" because the pro-

---

**5.** BOC and ICBC claim that plaintiffs request suspicious activity reports which the Banks are prohibited from producing by law (BOC/ICBC Mem. in Supp. at 16). The inclusion of this request does not render the subpoena overly broad.

**6.** Plaintiffs also claim that BOC did not search its Los Angeles branch for relevant documents and it is possible that responsive documents exist at that location (Pl.'s Mem. in Supp. at 14). Because the parties have not adequately briefed this issue, my decision addresses only the production of documents from the Banks' China branches.

cess is likely to be " 'unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules' " (Pl.'s Mem. in Supp. at 16, *quoting Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa,* 482 U.S. 522, 542–44, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987)).

### (1) *China's Record of Enforcement of Hague Convention Requests*

First, plaintiffs argue that the United States Department of State had previously posted on its website that

> While it is possible to request compulsion of evidence in China pursuant to a letter rogatory or letter of request (Hague Evidence Convention), such requests have not been particularly successful in the past. Requests may take more than a year to execute. It is not unusual for no reply to be received or after a considerable time has elapsed, for Chinese authorities to request clarification from the American court with no indication that the request will eventually be executed

(Pl.'s Mem. in Supp. at 17; State Department Circular, attached to Weigel Decl. as Ex. 29, (the "Circular") at 5). The Banks correctly note that this language has been removed from the State Department website (BOC/ICBC Mem. in Supp. at 18; CMB Mem. in Supp. at 17–18). The State Department has not explained its reason for the removal, but BOC and ICBC claim that it suggests that the State Department no longer believes the statement to be accurate (BOC/ICBC Mem. in Supp. at 2).

CMB correctly points out that plaintiffs fail to cite the language from the State Department's website that states "The United States is seeking clarification from the Government of the People's Republic of China concerning how the Hague Evidence Convention will be applied in China" (CMB's Mem. in Supp. at 17–18 n. 18; Circular at 6). CMB further notes that when this passage was posted, the Circular included citations to sources that were over fifteen years old, and ante-dated China's ratification of the Hague Convention in 1997 (CMB Mem. in Supp. at 17 n. 18; Circular at 7–8, *citing* Hague Conference on Private International Law, Status Table, http://www.hcch.net/index_en.php?act=conventions.status&cid=82). Moreover, CMB claims that China has actively implemented the Convention, and in 2003 designated China's highest local courts to directly forward and transfer judicial assistance requests in accordance with the Hague Convention (CMB's Mem. in Supp. at 18 n. 18, *citing* Huang Jin et al., *Chinese Judicial Practice in Private International Law: 2006,* 8 Chinese J. Int'l L. 715, 717 (2009)). BOC and ICBC specify that the Chinese Ministry of Justice has reported that over the last five years it has executed approximately 50% of the requests it has received, and that it takes an average of six to twelve months for a request to be executed. In the first half of 2010, the Ministry of Justice honored thirty-seven requests for evidence in commercial and civil matters (BOB/ICBC Mem. in Supp. at 2; Feinerman Decl. ¶ 12).

I agree with the Banks that the deletion of the language from the State Department's Circular that is critical of China's enforcement of Hague Convention requests implies that the conditions described by the omitted language no longer exist. There would be no reason for the State Department to withdraw the language if it were still accurate.[7]

---

7. The Banks further note that there are several examples of New York courts requiring parties to utilize the Hague Convention (BOC/ICBC Mem. in Supp. at 17–18; CMB Mem. in Supp. at 16–17, *citing Laker Airways Ltd. v. Pan American World Airways,* 607 F.Supp. 324, 326–27 (S.D.N.Y.1985) (Brieant, D.J.); *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa, supra,* 482 U.S. at 542–44, 107 S.Ct. 2542; *Hudson v. Hermann Pfauter GmbH & Co.,* 117 F.R.D. 33, 38 (N.D.N.Y.1987); *Orlich v. Helm Bros., Inc.,* 160 A.D.2d 135, 143, 560 N.Y.S.2d 10, 14–15 (1st Dep't 1990); *Ings v. Ferguson, supra,* 282 F.2d at 152; *In re Vivendi Universal, S.A. Sec. Litig.,* 02 Civ. 5571(RJH), 2004 WL 3019766 at *1 (S.D.N.Y. Dec. 30, 2004) (Holwell, D.J.); *Intercont'l Credit Corp. v. Roth,* 154 Misc.2d 639, 641–42, 595 N.Y.S.2d 602, 603 (Sup.Ct. New York Co.1991)). However, because none of these cases involve contemporary Hague Convention requests to China, they provide no assistance in predicting the effectiveness of the Hague Convention requests suggested by the Banks.

Accordingly, I conclude that the Banks have demonstrated that the State Department website language should no longer be given any weight since it has been deleted.

**(2)** *Plaintiffs' Contention that the Southern District Has Concluded the Hague Convention in China is Futile*

Plaintiffs cite *Milliken & Co. v. Bank of China, supra,* 758 F.Supp.2d at 248, and claim that the Southern District has specifically rejected the argument that plaintiffs may easily obtain documents in China through the Hague Convention (Pl.'s Mem. in Supp. at 17). The Banks argue that this case is not controlling because it was based on the language that has now been removed from the State Department's website (BOC/ICBC Mem. in Supp. at 18; CMB Mem. in Supp. at 18 n. 19). They also note that it is factually distinguishable because *Milliken* involved a "turnover" action following an unpaid judgment against a BOC customer. BOC asserted an affirmative defense, claiming that the account holder's property was subject to " 'claims of and security interests held by the Bank that are superior to any claim of Petitioner's,' " *Milliken & Co. v. Bank of China, supra,* 758 F.Supp.2d at 241–42, while also arguing that it should not be required to answer interrogatories or produce documents unless such demands were made pursuant to the Hague Convention. *Milliken & Co. v. Bank of China, supra,* 758 F.Supp.2d at 243. The Banks claim that the court's discussion of the Hague Convention was "at best an alternative holding" in light of the court's suggestion that as a party asserting an affirmative claim, BOC was in a poor position to resist the discovery procedures set forth in the Federal Rules of Civil Procedure (CMB Mem. in Supp. at 18 n. 19, *citing Milliken & Co. v. Bank of China, supra,* 758 F.Supp.2d at 245 (footnote omitted)).

Plaintiffs' argument is based on a fundamental misapprehension of the principles of *stare decisis.* An opinion of a District Judge does not bind the court in which the District Judge sits. *Hawkins v. Steingut,* 829 F.2d 317, 321 (2d Cir.1987); *Bishop v. Henry Modell & Co.,* 08 Civ. 7541(NRB), 2009 WL 3762119 at *10 n. 10 (S.D.N.Y. Nov. 10, 2009) (Buchwald, D.J.); *Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.,* 421 F.Supp.2d 741, 768 n. 22 (S.D.N.Y. 2006) (Leisure, D.J.). *Milliken* does not, therefore, constitute binding precedent, although it does have some persuasive power.

**(3)** *Expert Opinions*

Plaintiffs next rely on the opinion of Donald Clarke, a professor at George Washington University Law School (Pl.'s Mem. in Supp. at 18–19). Specifically, plaintiffs rely on Clarke's opinion that " 'a Hague Convention request [to China] issued by a United States court is not a realistic or meaningful option for the Plaintiffs in [a counterfeiting] case to obtain the information that they seek' concerning the bank records of the counterfeiters" (Pl.'s Mem. in Supp. at 17–18; Declaration of Donald Clarke, dated Jan. 3, 2010 and attached to Weigel Decl. as Ex. 22 ("Clarke Decl."), ¶¶ 21–22).

BOC and ICBC correctly note that Professor Clarke cites to a website entitled "China Law Blog," which in turn cites to the obsolete version of the State Department's website, to support his opinion (BOC/ICBC Mem. in Supp. at 18–19; *see* Dan Harris, *How to Sue a Chinese Company. Part II. Discovery,* China Law Blog, Nov. 9, 2010, http://www.chinalawblog.com/2010/11/how_to_sue_a_chinese_company_part_ii_discovery.html).[8]

---

**8.** CMB also notes that three years ago Professor Clarke opined that

> Chinese law, at least insofar as its provisions have been cited by the BOC, does not prohibit the BOC from complying with the order of a United States court to disclose information about customer accounts, to freeze such accounts, or ultimately to transfer funds from such accounts to a judgment creditor

(2008 Declaration of Donald Clarke, dated June 27, 2008 and attached to Clarke Decl. as Ex. B).

Now, however, Professor Clarke claims that Chinese Law does have that effect (Clarke Decl. ¶ 12). In fact, Professor Clarke appears to assert that his prior impression was based solely on the provisions of Chinese law BOC cited in 2008, while his current position is informed by the additional provisions BOC currently cites (Clarke Decl. ¶¶ 12–14). This potential equivocation is not relevant to Clarke's analysis of the futility of the Hague Convention request.

Plaintiffs also rely on the opinion of William Alford, Director of East Asian Legal Studies at Harvard Law School, in which he states " 'it does not seem likely that a Hague Convention request issued by a United States court would result in Plaintiffs in this case obtaining the information they seek.' " Alford, in turn, cites to five other reports supporting a similar conclusion (Pl.'s Reply Mem. at 14–15; Declaration of William Alford, dated May 24, 2011 (Docket Item 34), ("Alford Decl.") ¶¶ 23, 26).

BOC and ICBC's expert, Professor James Feinerman, professor of Asian Legal Studies at Georgetown University Law Center, opines that " 'China, especially now given its economic and legal progress in the last few years, would honor a properly tailored request for information through the Hague Convention' " and notes that in the first half of 2010, the Chinese Ministry of Justice honored thirty-seven requests for evidence in commercial and civil matters (BOC/ICBC Mem. in Supp. at 19; Feinerman Decl. ¶¶ 12, 15; Chinese Ministry of Justice Report, attached to Healy Decl. as Ex. C).

Similarly, Zhipan Wu, professor of law, Executive Vice Chancellor and Dean Emeritus at Peking University Law School, asserts that

> China is going through rapid development, and in the last 20 years has overhauled its judicial and regulatory systems to become in line with international conventions. There is every reason to expect that Chinese courts will follow through on this development and will respond to a Hague Convention request issued by a U.S. court

(Wu Decl. at ¶ 36).

Conflicting expert opinions are not unique to this case. To the extent these opinions, and the sources they cite, rely on the formerly extant version of the State Department website, they are less compelling. However, because these experts appear to interpret the same empirical data divergently, these declarations do little to push this factor more clearly in favor of plaintiffs or the Banks.

### (4) *Relevant Literature*

Plaintiffs also cite a 2008 paper concerning China's treatment of Hague Convention requests which states that few litigants have successfully obtained documents from China through the Hague Convention, and a 2011 article stating that utilization of a Hague Convention request in China may prove difficult (Pl.'s Mem. in Supp. at 18 n. 14; International Discovery, dated August 2008 and attached to Weigel Decl. as Ex. 30, ("International Discovery") at 35–36; Stephanie A. Scharf et al., *Discovery of Documents and People Abroad,* PLIREF–PLL § 14:3 (2011)). BOC and ICBC correctly note that the sections in these articles concerning document discovery from China pursuant to the Hague Convention were based on Chinese laws restricting disclosure and the now-deleted State Department language (BOC/ICBC Mem. in Supp. at 19).[9] Thus, for the reasons set forth in Section III.C.4(1), these articles are not useful for this analysis.

### (5) *China's Article 23 Reservation*

Finally, plaintiffs note that in 1998 China adopted a reservation under Article 23 of the Hague Convention in which it stated that it will only execute pre-trial discovery requests for documents which are clearly enumerated in the request and which are of direct and close connection to the subject matter of the litigation (Pl.'s Mem. in Supp. at 18; Circular at 5–6). Plaintiffs claim that this reservation indicates that China retains great discretion in determining whether to honor a request (Pl.'s Mem. in Supp. at 18–19, *citing* International Discovery at 35–36 *and* Fang Shen, *Are You Prepared for this Legal Maze?,* 72 U. Mo. Kan. C.L.Rev. 215 (2003), at 232). CMB correctly points out that the law review article plaintiffs cite contains no authority for its conclusion (CMB Mem. in Supp. at 19 n. 20).

More importantly, this reservation has been adopted by thirty-six Hague Convention signatories, including the United Kingdom

---

**9.** CMB also argues that the statement in the 2008 article that lawyers in China have been told that the Beijing high court executes one such request per year is unsupported, but nevertheless provides evidence of the fact that China does execute some Hague requests (International Discovery at 36).

and Switzerland, and, thus, the reservation does not demonstrate that China would refuse to execute a request for the documents plaintiffs seek (CMB Mem. in Supp. at 20, *citing* Hague Evidence Convention, Declarations Reservations, http://www.hcch.net/index_en.php?act=conventions.status&cid=82). While it is not possible to conclude definitively whether China would execute a request for the documents plaintiffs seek, the documents at issue certainly appear to be closely related to the litigation, and, therefore, plaintiffs' request is not clearly prohibited by this reservation.

Finally, while the Banks have not provided any examples of China executing a Hague request submitted by a United States trademark owner in a counterfeiting case (Pl.'s Mem. in Supp. at 19), CMB is correct to note that plaintiffs have not provided any examples in which China rejected such a request (CMB Mem. in Supp. at 20). CMB notes that the Chinese legal system has been developing rapidly over the last several years, and, therefore, there is little precedent concerning Chinese handling of Hague Convention requests (CMB Mem. in Supp. at 19). However, there is evidence that China has honored many judicial requests for documents. As noted in Section III.C.4(1), in the first half of 2010, the Chinese Judicial Assistance Center reported that it provided assistance to the Foreign Affairs Department of the Ministry of Justice "in respect of judicial assistance requests for civil and commercial cases including ... investigation and evidence collection for 37 cases and 11 other cases" (Chinese Ministry of Justice Report, attached to Healy Decl. as Ex. C).

### (6) *Summary of Plaintiffs' Futility Argument*

Plaintiffs' five arguments in support of their contention that the Hague Convention is not a viable alternative method for obtaining the information sought are not entirely persuasive. While it appears that the United States State Department has expressed doubt about China's implementation of Hague Convention requests in the past, the State Department no longer expresses this view. The State Department's deletion of this language renders the expert opinions which relied on it less persuasive. Moreover, it appears that the Chinese courts have increased their execution of these requests over time, but because this is a relatively recent enterprise, there is a dearth of information as to the current efficiency of this procedure. In light of the evidence that China does execute these requests, albeit at a rate that is likely not ideal for plaintiffs, I cannot conclude that this avenue is futile. This factor, therefore, weighs in the favor of the Banks.

### 5. *Interests of the States*

The Banks argue that China has a significant interest in enforcing its bank secrecy laws. Professor Feinerman asserts that these laws have been adopted to create confidence in a relatively new banking system and to "[e]ncourag[e] its citizens who had historically been skeptical about the safety of their deposits in banks—and their continued access to them—[to utilize Chinese banks by providing] the strongest possible assurances of confidentiality" (BOC/ICBC Mem. in Supp. at 20; Feinerman Decl. ¶ 24; CMB Mem. in Supp. at 21; Wu Decl. ¶¶ 9–11).

Plaintiffs' arguments that this interest is entitled to diminished consideration because "competent organs" in China can gain access to these banking records, and account holders can waive their confidentiality, are not persuasive. Chinese law provides that only a limited number of Chinese bodies,[10] or account holders themselves, may access this information, thereby protecting individuals from indiscriminate intrusion. While it is true that "an absolute waiver of [ ] protections by the customer" has been considered significant in this analysis by the Second Circuit, this is not the deciding factor. *See Gucci America, Inc. v. Curveal Fashion, supra*, 2010 WL 808639 at *6, *citing United States v. First Nat'l Bank, supra*, 396 F.2d at 902. Moreover, there is no evidence that the account holders who would be affected by

---

**10.** Chinese law provides that "competent organs" including " 'the judicial organs, administrative organs, military organs and public institu-

tions exercising administrative functions' " could retrieve account information and potentially submit it to a foreign court (Feinerman Decl. ¶ 33).

the execution of plaintiffs' requests here have, in fact, waived their rights. China's multitude of criminal and civil regulations on the subject also evidence its strong interest in bank confidentiality.

Plaintiffs also claim that the true Chinese interest at issue is protecting against illicit or corrupt disclosure only. They claim that disclosure pursuant to a foreign court order does not contravene this policy (Pl.'s Reply Mem. at 16–17; Alford Decl. ¶ 12). However, the applicable Chinese regulations are not limited to illicit or corrupt disclosures, and prosecutions have not required it. In fact, BOC reports that it has been held liable for violating these laws unintentionally (BOC/ICBC Mem. in Supp. at 21; Feinerman Decl. ¶¶ 26, 51).

Still, plaintiffs argue that the " 'United States interest in fully and fairly adjudicating matters before its courts ... outweighs [a foreign country's] interest in protecting the confidentiality of its banking customers' records' " (Pl.'s Mem. in Supp. at 20, *quoting Gucci America, Inc. v. Curveal Fashion, supra,* 2010 WL 808639 at \*7; *Milliken & Co. v. Bank of China, supra,* 758 F.Supp.2d at 248–50; *Ssangyong Corp. v. Vida Shoes Int'l, Inc., supra,* 2004 WL 1125659 at \*11; *In re Air Cargo Shipping Servs. Antitrust Litig.,* —— F.R.D. ——, —— (E.D.N.Y.2010)). Additionally, plaintiffs note that the United States has a strong interest in enforcing its trademark laws (Pl.'s Mem. in Supp. at 20, *citing Gucci America, Inc. v. Curveal Fashion, supra,* 2010 WL 808639 at \*5; *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,* 219 F.3d 104, 107–08 (2d Cir.2000); *Gayle Martz, Inc. v. Sherpa Pet Grp., LLC,* 651 F.Supp.2d 72, 85 (S.D.N.Y.2009) (Baer, D.J.)).

BOC and ICBC claim that the United States interest in this matter is mitigated by the fact that this information is of " 'indirect and attenuated significance to the issues to be decided' " (BOC/ICBC Mem. in Supp. at 20, *quoting Linde v. Arab Bank, PLC, supra,* 262 F.R.D. at 151 *and Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd.,* 5:04 CV 1153, M8–85 (HB), 2005 WL 3046284 at \*2 (S.D.N.Y. Nov. 14, 2005) (Baer, D.J.)). However, as noted in Section III. C.1., this information is directly related to

plaintiffs' claims. Still, the Banks' status as non-parties does attenuate the United States interest in enforcing discovery obligations. *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., supra,* 2005 WL 3046284 at \*2, *citing Minpeco v. Conticommodity Servs., Inc., supra,* 116 F.R.D. at 530. Moreover, CMB is correct that the cases plaintiffs cite that recognize the United States interest in the enforcement of its trademark laws do not hold that this interest necessarily trumps a foreign sovereign's interest in bank confidentiality (CMB Mem. in Supp. at 22).

While the present case bears some similarities to *Curveal* in that the protections afforded by Chinese law can be waived by the customer and China has not yet voiced any objection to the production of the documents, it is distinguishable because Chinese law, unlike the Malaysian law at issue in *Curveal,* explicitly prohibits disclosure of the information plaintiffs seek. *Gucci America, Inc. v. Curveal Fashion, supra,* 2010 WL 808639 at \*6–7. China's pertinent regulations appear to have very narrow exceptions, while those in Malaysia had several, indicating that there is a stronger foreign interest in this case than in *Curveal.*

Plaintiffs' reliance on *Milliken & Co. v. Bank of China, supra,* 758 F.Supp.2d at 244–45, is also somewhat misplaced because the Court noted that because it was dealing with initial disclosures, required by a party, the sovereignty of the foreign state was implicated to a lesser extent than if it were dealing with demands for production directed to a non-party witness.

Plaintiffs also cite *In re Air Cargo Shipping Servs. Antitrust Litig., supra,* —— F.R.D. at ——, which dealt with a French blocking statute—a statute that has the objective of "controlling access to information within [France's] borders"—as opposed to the Chinese regulations which are meant to foster a greater trust in the Chinese banking system. Because the interests are not comparable, this case is not instructive. Likewise, plaintiffs also rely on *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., supra,* 219 F.3d at 107–08, and *Gayle Martz, Inc. v. Sherpa Pet Grp., LLC, supra,* 651 F.Supp.2d

at 85. In those cases, the Court discussed the important public policy concerns protected by trademark law, but did not do so in the context of enforcement of a subpoena directed to a foreign entity, and did not address any conflicting foreign interests similar to those protected by China. Accordingly, those cases do little to determine whether those interests should outweigh the foreign interests in this case.

While the United States certainly has an interest in enforcing its orders and protecting trademark rights, the Chinese interest in protecting its account holders' confidentiality appears more significant in this case. The regulations at issue have few exceptions and appear to provide harsh consequences for violations. The fact that the Banks are nonparties further pushes this factor in favor of the Banks.

### 6. Nature of the Hardship

The Banks argue that they and their personnel would be forced to violate Chinese law and be subject to civil and criminal punishment if they were required to produce customer account information located in China (ICBC/BOC Mem. in Supp. at 21; CMB Mem. in Supp. at 22; Wu Decl. ¶¶ 21–28).

The Banks' status as non-parties weighs against compelling production of documents in violation of Chinese law because such an order " 'should be imposed on a nonparty . . . only in extreme circumstances' " (BOC/ICBC Mem. in Supp. at 21, citing *Linde v. Arab Bank, PLC, supra,* 262 F.R.D. at 151). *See also Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., supra,* 2005 WL 3046284 at *2; *Minpeco S.A. v. Conticommodity Services, Inc., supra,* 116 F.R.D. at 526–27. The Banks need not prove that they will certainly be punished if forced to comply with plaintiffs' subpoenas, but they must show that the possibility of civil and/or criminal punishment for disclosure is more than speculative. *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.,* 90 Civ. 2370(JFK)(FM),

2000 WL 713057 at *8 (S.D.N.Y. June 2, 2000) (Maas, M.J.) ("[T]he party relying on foreign law has the burden of showing that such law actually bars [the] production.") (internal quotations and citations omitted); *see also Milliken & Co. v. Bank of China, supra,* 758 F.Supp.2d at 249–50.

Contrary to plaintiffs' argument, *Milliken & Co. v. Bank of China, supra,* 758 F.Supp.2d at 249–50, does not resolve this issue. In *Milliken,* BOC was attempting to assert a prior claim to the assets at issue without providing discovery. The Court there compelled discovery notwithstanding the prohibition of Chinese law because it found that BOC had " 'cited no instance in which such sanctions have been imposed' " and that the threat of prosecution was, therefore, speculative. *Milliken & Co. v. Bank of China, supra,* 758 F.Supp.2d at 249–50, citing *In re Air Cargo Shipping Servs. Antitrust Litigation,* No. 06 MD 1775, 2010 WL 2976220 at *2 (E.D.N.Y. July 23, 2010)[11]; *Gucci America, Inc. v. Curveal Fashion, supra,* 2010 WL 808639 at *7. Unlike *Milliken,* the Banks here have cited Chinese cases in which a commercial bank was held liable to its customer after turning over the individual's funds or information to a third party. For example, in *Ruihua Li v. Agricultural Bank of China Jinggangshan Branch,* Jing Min Chu Zi No. 220 (People's Court of Jiggangshan City, Jiangxi Province, Nov. 10, 2008), (attached to Wu Decl. as Ex. B–7), an account holder sued BOC for transferring funds from his bank account to his creditor. The court ruled that the bank had to return the funds, unless the creditor did so first, because BOC may not " 'disclose information about, freeze or turn over funds from the account of a depositor in favor of a third party' " without following the proper legal procedures (Wu Decl. ¶ 23; *see* Ruigua Li case, attached to Wu Decl. as Ex. B–7; Feinerman Decl. ¶ 45).

In another case, *Yongsheng Wang v. Bank of China Nanjing Hexi Branch,* Gazette of the Supreme People's Court of the Republic

---

**11.** It is unclear from the record whether BOC ever produced the information requested in *Milliken.* It appears that the case settled before production occurred. It is therefore not possible to ascertain whether BOC was, or would have been, sanctioned civilly or criminally for complying with the Court's order.

of China, Issue No. 2 2009, pp. 44–48 (People's Court of Gulou District, Nanjing City, Jiangsu Province, Nov. 26, 2008), (attached to Wu Decl. as Ex. B–8), BOC was held liable to a customer whose information and deposited funds were illegally obtained by three individuals using an ATM card reader and miniature video camera (Wu Decl. ¶ 24; Wang Case, attached to Wu Decl. as Ex. B–8; Feinerman Decl. ¶ 40). The BOC branch was held liable to the customer in part because " 'it is the obligations of a commercial bank under the Commercial Bank Law to keep the information of the depositor confidential . . . against the encroachment of any entity or individual' " (Wu Decl. ¶ 24; Wang Case, attached to Wu Decl. as Ex. B–8; Feinerman Decl. ¶ 41). The Banks' experts argue that if BOC's unintentional breach of its obligation to protect account information and funds was punished, "a Chinese court will have no qualms in adjudging [the Banks] liable to the customer" for intentional breaches (Wu Decl. ¶ 25; Feinerman Decl. ¶ 47).[12]

In addition, the Banks' expert, Zhipan Wu notes that Article 253(A), which was enacted in October 2009, was used to prosecute defendants who illegally acquired personal information about individuals in China and sold it for profit. Those defendants were sentenced to between three and eleven years in jail (Wu Decl. ¶ 28, *citing People's Prosecutor of Xiangzhou District, Zhuhai Municipality v. Shao Guosong, Zhou Jianping,* Xiang Xing Chu Zi No. 1337 (2009), attached to Wu Decl. as Ex. B–9). Although these circumstances are distinguishable, the case demonstrates that Article 253(A) statute has been used to prosecute individuals and that violations can result in serious punishment.

While plaintiffs are correct that none of these examples are identical to the present case, they fail to cite any instances in which Chinese banks complied with a United States court order compelling production of documents without negative consequence. Plaintiffs inability to cite such evidence, however, may be the result of the fact that there is no comprehensive compilation of judicial or prosecutorial actions in China (Wu Decl. ¶ 30). Nevertheless, because these regulations have been used to the detriment of banks in the past, and the potentially harsh sanctions are applicable to both the Banks and their personnel, the potential for hardship places this factor in favor of the Banks.[13]

Finally, to the extent plaintiffs contend that because the Banks do business in the United States they should be compelled to produce the documents, their argument is unavailing. An entity's presence in the United States, without more, does not obviate the need for a comity analysis where compliance with a discovery request would violate foreign law. Likewise, plaintiffs' claim that the Banks "made the decision to seek profits by participating in" this counterfeiting scheme is inaccurate; plaintiffs have submitted no evidence suggesting that the Banks had any awareness of the source of the funds at issue (Pl.'s Mem. in Supp. at 24).

---

**12.** Plaintiffs' argument that the Banks are less likely to be prosecuted because the Chinese government owns an interest in these institutions is unpersuasive. It is clear that account holders can sue such institutions pursuant to these regulations, and have done so (Feinerman Decl. ¶¶ 54–57; Wu Decl. ¶¶ 31–33). Moreover, plaintiffs have presented no evidence that the Chinese authorities will fail to apply Chinese law to the Banks simply because they are partially owned by the Chinese government (Pl.'s Mem. in Supp. at 23–24).

**13.** Plaintiffs claim that *Gucci America, Inc. v. MyReplicaHandbag.com,* 07 Civ. 2438(JGK), 2008 WL 512789 (S.D.N.Y. Feb. 26, 2008) (Koeltl, D.J.), demonstrates that the Banks are unlikely to be sanctioned for producing the requested documents because BOC allowed inspec-

tion of similar documents during that litigation and did not suffer any negative consequences (Pl.'s Mem. in Supp. at 22 n. 17). However, that case involved a defendant who appeared and consented to abide by a TRO which provided for disclosure, only to refuse to provide additional written consent to BOC (Stipulation, dated April 17, 2007 and attached to Saperstein Decl. as Ex. O; Letter of Walter Loughlin, dated June 21, 2007 and attached to Weigel Decl. as Ex. 20). BOC claims that the defendant threatened to sue BOC in China following the freeze of his account (BOC/ICBC Mem. in Supp. at 22). Because it appears these issues were resolved in a series of settlements, the specifics of which are not stated in the record (BOC/ICBC Mem. in Supp. at 22), and because of its distinguishable factual situation, I do not find this case instructive.

### 7. *Good Faith of the Party Resisting Discovery*

There is no evidence in the record that the Banks are acting in bad faith. Plaintiffs are incorrect that the Banks have acted like the bank in *Milliken* in repeatedly failing to produce requested documents (Pl.'s Mem. in Supp. at 25). The Banks contacted plaintiffs after receiving the PI Order and subpoenas, relayed the information found in their New York branches, and offered to help draft a Hague Convention request. The fact that the Banks chose to object to the subpoenas as opposed to seeking relief from the PI Order does not indicate bad faith.[14]

### D. *Summary of Comity Analysis*

While the first two prongs of the comity analysis, namely the importance of the information and the specificity of the request, weigh in favor of plaintiffs, every other factor weighs in favor of the Banks.

Specifically, the fact that the information requested is located in China puts the third factor in favor of the Banks. The fourth factor, analyzing whether there is an alternative means for securing the information, similarly favors the Banks. The fact that the State Department removed language on its website critical of China's enforcement of Hague Convention requests implies that the omitted language is no longer accurate. Accordingly, case law, secondary sources and expert opinions which rely on this language to conclude that a Hague Convention request in China is not a viable mechanism for this kind of discovery are not persuasive. Moreover, I do not believe that China's Article 23 reservation will necessarily preclude discovery of the documents plaintiffs seek because this reservation purports to limit execution of pre-trial discovery requests to those which are clearly enumerated and concern documents directly and closely related to the subject matter of the litigation. Because I find that these documents are so related, I do not agree that this will necessarily be a barrier to production.

The fifth factor, the respective interests of the states, also resolves in favor of the Banks, albeit more narrowly. While the United States certainly has a general interest in enforcing its laws and protecting trademark rights, the Banks' non-party status mitigates against these interests in this case. China's interest in protecting bank customers' privacy and encouraging use of, and confidence in, its relatively new banking system is evidenced by the multitude of civil and criminal regulations it has enacted to protect these interests. The potentially harsh sanctions and narrow exceptions to these regulations indicate that China's interests in cases such as this one are more significant than those at issue for the United States.

The sixth factor, examining the nature of the hardship imposed upon the foreign party, also weighs in favor of the Banks. Were the Banks to disclose the requested information in contravention of Chinese law, they could be subject to civil and criminal sanctions. Plaintiffs are correct that the examples in the record in which the Banks have been held liable for violations of these regulations are not analogous to the case at hand. However, there is no indication that the Banks will not be prosecuted for violating these same regulations pursuant to a Court Order from the United States. The lack of records of Chinese judicial decisions on this issue prevents a comprehensive review of the application of these regulations. Because the Banks and their personnel could potentially be severely sanctioned for such disclosure, this factor also weighs in favor of the Banks.

Finally, there is no indication that the Banks have acted with bad faith in this matter. Accordingly, this prong also weighs in their favor.

### IV. *Conclusion*

For all the foregoing reasons, plaintiffs are directed to request the information they seek in China through the Hague Convention at this time. Should this process prove futile,

---

**14.** Plaintiffs also claim that the Banks acted in bad faith by not contacting the account holders at issue to request consent (Pl.'s Mem. in Supp. at 25). It is unclear from the record whether the Banks have done so.

plaintiffs may renew their application to enforce their subpoenas.

SO ORDERED,