**MOTOROLA CREDIT CORPORATION and Nokia Corporation, Plaintiffs,**

v.

**Kemal UZAN, et al., Defendants.**

**No. 02 Civ. 666 (JSR).**

United States District Court,
S.D. New York.

Aug. 12, 2013.

Gordon M. Clay, John F. O'Connor, Steven K. Davidson, Steptoe & Johnson, L.L.P., Howard H. Stahl, Fried, Frank, Harris, Shriver & Jacobson, LLP, Washington, DC, Mishell B. Kneeland, Munsch Hardt Kopf & Harr, P.C., Austin, TX, Jason Brown, Ropes & Gray, LLP, New York, NY, for Plaintiffs.

Kenneth M. Bialo, Emmet, Marvin & Martin, LLP, Mark Benjamin Holton, Robert F. Serio, Thomas C. Sheehan, Gibson, Dunn & Crutcher, LLP, New York, NY, for Defendants.

## MEMORANDUM ORDER

JED S. RAKOFF, District Judge.

On July 31, 2003, this Court awarded plaintiff Motorola Credit Corporation ("Motorola") damages in the amount of $2,132,896,906 against defendants Kemal Uzan, Murat Hakan Uzan, Cem Cengiz Uzan, Melahat Uzan, Aysegul Akay, and Antonio Luna Betancourt (the "Uzans"), based on the Uzans' diversion of large loans made by plaintiffs to Telsim, a Turkish telecommunications company owned in large part by the Uzans.[1] Since that time, the Uzans—most of whom are fugitives from criminal indictments in Turkey brought as a result of a separate fraud—have failed to participate in this action or pay the judgment against them, and Motorola has engaged in a worldwide, decade-long hunt for the Uzans and their assets.

In recent months, this Court has issued two orders relevant to the instant motion.

---

1. In June 2006, Motorola obtained an additional judgment for $1 billion in punitive damages. *See* Order, No. 02 Civ. 666, ECF No. 675 (S.D.N.Y. June 15, 2006).

First, in November 2012, the Court permitted Motorola to serve *ex parte* discovery requests on third parties in order to gather information about the Uzans' "and/or their agents' assets or whereabouts." Order Regarding Service of *Ex Parte* Discovery Requests, No. 02 Civ. 666 (S.D.N.Y. Nov. 19, 2012).[2] Second, on February 13, 2013, the Court issued an injunction and restraining order, which (1) enjoined the Uzans, their agents, and anyone receiving notice of the Order from transferring or dissipating any Uzan assets until Motorola's judgment is paid in full; and (2) required any subpoenaed party in possession of property of the Uzans or their agents to immediately freeze and restrain access to such property. *See* Order Granting Injunctive Relief and Restraining Order ("Injunction and Restraining Order"), No. 02 Civ. 666 (S.D.N.Y. Feb. 13, 2013). Attached to the Court's Order was a list of "Uzan Proxies," defined as "entities or persons that serve as agents or instrumentalities of or are otherwise controlled, directly or indirectly, by the Uzans." *Id.* ¶ 10 & Attach. A. As relevant to the instant dispute, the Jordan Dubai Islamic Bank ("JDIB"), an international commercial bank, is identified in Attachment A as an Uzan proxy.

On February 15, 2013, Motorola served the Injunction and Restraining Order, along with document subpoenas permitted by the November 2012 *ex parte* discovery Order, on the New York branch of Standard Chartered Bank, an international banking group headquartered in the United Kingdom, which has locations, as relevant here, in Jordan and the United Arab Emirates ("UAE"). After conducting a search in New York and globally for assets belonging to the Uzans or their identified proxies, Standard Chartered identified what it claimed were four interbank deposits placed by JDIB at a Standard Char-

tered branch in the UAE: three recent placements each in the amount of five million Jordanian Dinar, and a fourth in the amount of six million Jordanian Dinar, for a total of 21 million Jordanian Dinar ($30 million).[3] Decl. of Julian Slow dated May 10, 2013 ("Slow Decl.") ¶¶ 10, 15.

After seeking from Motorola clarification regarding the scope of the Injunction and Restraining Order, Standard Chartered froze JDIB's assets on April 26, 2013. On May 8 and 9, 2013, two payments were due to JDIB, but Standard Chartered refused to remit payment. *See* Decl. of Rakan Shiyab dated May 12, 2013 ("Shiyab Decl.") ¶ 5; Slow Decl. ¶ 15. Since that time, two other payments came due, and Standard Chartered again refused to remit payment. *See* Decl. of Jeremy Julian Ronald Trevis dated May 30, 2013 ("Trevis Decl.") ¶ 4. After Standard Chartered refused to process JDIB's payments, the Jordanian Central Bank seized documents from the office of Standard Chartered's local CEO; JDIB's CEO threatened to take legal action, *see* Supplemental Decl. of Rakan Shiyab dated May 13, 2013, Ex. B; and the UAE Central Bank debited from Standard Chartered's account the amounts owed to JDIB, *see* Trevis Decl. ¶¶ 6, 10.

On May 20, 2013 Standard Chartered obtained authorization from JDIB to disclose the amounts of the transfers, as well as certain documentation relating to the transfers, including the underlying contractual agreement providing for such transfers and certain transactional reports.[4] Motorola also sought from Standard Chartered any additional documents relating to similar transactions under the same agreement and communications between Standard Chartered and

---

2. Although it is not relevant to the instant motion, on May 11, 2013, the Court extended Motorola's authority to engage in such *ex parte* discovery. *See* Order Regarding Service of *Ex Parte* Discovery Requests, No. 02 Civ. 666 (S.D.N.Y. May 11, 2013).

3. Interbank deposits are short-term transfers of funds from a bank with excess liquidity to a bank facing excess liabilities, which are then repaid at an agreed-upon future date, with interest. *Id.* ¶¶ 3–4.

4. The Court notes that the contractual agreement providing for these transfers indicates that JDIB's assets are in fact four palladium commodities trades undertaken between Standard Chartered and JDIB for the same total value as the interbank transfers that Standard Chartered claims occurred. *See* Calhoun Decl. ¶¶ 12–14 & Exs. 7–9. The true nature of the transactions is largely irrelevant for purposes of the instant motion.

its regulators in the UAE and Jordan, which Standard Chartered has refused to produce.

On May 24, 2013, Motorola filed the instant motion to compel Standard Chartered to comply fully with Motorola's subpoena requests. Specifically, Motorola seeks: (1) any additional documents concerning JDIB's restrained assets, (2) all documents relating to assets currently or previously held by Standard Chartered for the Uzans, JDIB, or other Uzan proxies, (3) all documents relating to Standard Chartered's interactions with the Uzans, JDIB or other Uzan proxies, and (4) all communications with third parties concerning the Injunction and Restraining Order and/or the restraints, including communications with regulators in Jordan and the UAE.[5]

■ As a general matter, "broad post-judgment discovery in aid of execution is the norm in federal and New York state courts." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir.2012). "The scope of discovery under Rule 69(a)(2) is constrained principally in that it must be calculated to assist in collecting on a judgment," and "New York state's post-judgment discovery procedures ... have a similarly broad sweep." *Id.* (citing N.Y. C.P.L.R. § 5224(a–1)). However, "as in all matters relating to discovery, the district court has broad discretion to limit discovery in a prudential and proportionate way." *Id.*

The Court has previously found, in circumstances similar to those present here, that the Uzans' decade-long history of attempting to hide assets throughout the world and in the names of proxy entities and individuals necessitates Motorola's conducting broad and widespread discovery. Additionally, the Court has held that New York's "separate entity rule"—which requires a judgment creditor to serve notices seeking post-judgment enforcement on the specific bank branch where the assets to be restrained are located—does not apply to post-judgment discovery efforts of the kind embodied in Motorola's subpoenas. *See* Memorandum Order at 8–9, No. 02 Civ. 0666 (S.D.N.Y. May 23, 2013) (citing *EM Ltd.*, 695 F.3d at 208); *see also Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, No. 10 Civ. 5256, 2013 WL 541259, at *10 (S.D.N.Y. Feb. 11, 2013) (stating that *"EM* conclusively held that a court should not conflate" post-judgment discovery and attachment and that "Respondent must comply with discovery regarding its assets, regardless of whether those assets are ultimately attachable"). Thus, absent special considerations, this Court may properly order that Standard Chartered comply with Motorola's subpoena requests.

■ Standard Chartered contends that the fact that local criminal law, civil law, and bank regulations in the UAE and Jordan forbid Standard Chartered's branches there from turning over certain records and communications provides such a reason to deny Motorola's motion to compel. Specifically, Standard Chartered sets forth in a declaration the particular provisions of UAE law that it claims prohibit disclosure[6]: (1) as to the criminal law, Article 379 of the UAE Penal Code prohibits disclosure of "secret[s]" entrusted to an individual "by reason of his profession, craft, situation, or art," which includes the disclosure of bank customer or account information, transaction documents, and correspondence with customers, and provides that those who violate the law may be subject to up to one year in jail and a fine of at least 20,000 Dirhams (about $5,500), Decl. of Husam Hourani dated June 12, 2013 ("Hourani Decl.") ¶¶ 6–8, 16; (2) Articles 386 and 389 of the UAE Civil Code enable a person affected by an unauthorized disclosure to impose civil liability on Standard Chartered, *id.* ¶¶ 11–12; and (3) the UAE

---

**5.** After extensive briefing, the Court, on May 30, 2013, ordered that Motorola could not require Standard Chartered to restrain JDIB's assets; however, the details of the Court's decision are not relevant to the instant dispute, except where described herein. *See* Order, No. 02 Civ. 0666 (S.D.N.Y. May 30, 2013); Opinion, No. 02 Civ. 0666 (S.D.N.Y. Aug. 1, 2013).

**6.** Standard Chartered similarly details the provisions of Jordanian law that would apply to documents located in Jordan. For brevity's sake, the Court focuses on UAE law here and merely notes that Jordanian law is essentially similar. *See generally* Decl. of Khaled Al Saqqaf dated June 12, 2013.

Central Bank's regulations prohibit disclosure of information exchanged between Standard Chartered and its customers, as well as between Standard Chartered and the UAE Central Bank, and a violation of this requirement could subject Standard Chartered to fines or revocation of its local license, *id.* ¶¶ 20–21, 23. However, Standard Chartered may disclose confidential information about a customer under UAE law with the customer's permission (as it previously received with respect to the limited documents produced), or pursuant to a UAE court order, or by providing the information to the UAE Central Bank, which would act as an intermediary between the bank and the requesting authority. Motorola has not chosen to pursue any of these alternatives. *Id.* ¶¶ 6, 10, 22.

The fact that Jordanian and UAE regulatory authorities have already seized documents and funds from Standard Chartered in relation to this action indicates that a conflict with UAE and Jordanian law is more than mere speculation in this case. Given this conflict, the Court must conduct an international comity analysis to determine whether to enforce the subpoena under U.S. discovery practices or to defer to Jordanian and UAE law. *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa,* 482 U.S. 522, 543–44, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987). In conducting such an analysis, courts look to the following factors:

(1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of retrieving the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

*Tiffany (NJ) LLC v. Qi Andrew,* 276 F.R.D. 143, 151 (S.D.N.Y.2011). "In addition, courts in the Second Circuit may also consider the hardship of compliance on the party or witness from whom discovery is sought [and]

the good faith of the party resisting discovery." *Id.* The Court addresses in turn each factor with respect to Motorola's request for documents relating to Standard Chartered's transactions with JDIB, the Injunction and Restraining Order, and Standard Chartered's communications with its regulators:

*Importance of the Documents:* Standard Chartered argues that the importance of any documents located in the UAE and Jordan is greatly reduced by the fact that, as determined by the Court's Order dated May 30, 2013, the separate entity rule precludes Motorola from restraining assets located abroad. Standard Chartered further argues that Motorola's request for access to communications between Standard Chartered and its local regulators in the UAE and Jordan is not calculated to assist in Motorola's judgment-collection efforts, so these documents have even less importance. However, although Motorola has not yet done so, it may yet seek to enforce its judgment against assets located abroad by pursuing an action, for example, in the UAE. Thus, while the documents sought by Motorola are not as unimportant as Standard Chartered claims, the fact that Motorola has announced no intention to pursue alternative methods of enforcement suggests that the documents have only limited importance at this stage, and this factor weighs weakly in favor of Standard Chartered's position. *See Minpeco, S.A. v. Conticommodity Servs., Inc.,* 116 F.R.D. 517, 529–30 (S.D.N.Y. 1987) ("[A] court is less willing to order a foreign witness to engage in conduct in a foreign country that will violate that country's laws ... where the need for the information located abroad is less crucial to the litigation.").

*Degree of Specificity of the Subpoena Requests:* Standard Chartered argues that Motorola's request is not the kind of targeted request that is usually deemed sufficiently specific to justify such a request of a nonparty, as the list of Uzan proxies includes dozens of individuals and entities along with both English and Arabic variations of many of the entities. However, this Court has already determined that Motorola's subpoena requests are as narrowly tailored as reasonably possible given the Uzans' diverse, com-

**600**

plex, and concerted efforts to conceal their assets from their creditors, and, in this context, the requests are not excessively overbroad or burdensome. *See* Memorandum Order at 10–11, No. 02 Civ. 0666 (S.D.N.Y. May 23, 2013). Therefore, this factor weighs in favor of disclosure.

*Whether the Information Originated in the United States:* It is largely uncontested that the information at issue here did not originate in the United States. Although "this factor is not determinative," *NML Capital, Ltd. v. Republic of Argentina,* No. 03 Civ. 8845, 2013 WL 491522, at *10 (S.D.N.Y. Feb. 8, 2013), the undisputedly foreign character of the documents nonetheless weighs against disclosure. *See Tiffany,* 276 F.R.D. at 152 ("The overseas location of this information weighs in favor of the Banks.").

*Availability of Alternative Means of Discovery:* Although Standard Chartered argues that Motorola may seek discovery directly from JDIB by serving it with a subpoena, this suggestion is unrealistic given the Uzans' history of contempt of court, leaving third-party discovery as Motorola's only meaningful option for locating Uzan assets. However, if the Court were to deny Motorola's motion to compel Standard Chartered to disclose the documents, it is not clear that Motorola would be left entirely without options for seeking such documents from Standard Chartered by other means, including, for example, seeking the assistance of the UAE Central Bank in obtaining customer records. Therefore, this factor tips only slightly in favor of disclosure.

*Balancing the Interests of the United States and the UAE and Jordan:* Standard Chartered argues that, although the United States has an interest in enforcing its judgments, that interest is lessened here because this is a private civil suit, and Standard Chartered is a non-party. At the same time, Standard Chartered argues, the UAE and Jordan have made clear through their involvement in this action that they deem significant national interests—including the regulation of their financial markets and control over the manner in which foreign judgments are enforced in their countries—to be at

stake in this proceeding. Additionally, Standard Chartered argues that courts have recognized that foreign states may have a substantial interest in protecting privacy rights, particularly where a state has enacted civil and criminal penalties to protect those rights. *See Linde v. Arab Bank, PLC,* 262 F.R.D. 136, 151 (E.D.N.Y.2009) (recognizing Israel's "important" interest in "maintaining the privacy rights of bank clientele and the confidentiality of sensitive communications with Israel's central bank" as part of "maintaining public trust in the ... confidentiality of the banking system").

While Motorola claims that the regulatory actions take by Jordan and the UAE, each of which has an ownership interest in JDIB, suggest, not the actions of a sovereign, but an interested party, the Court is unwilling to adopt Motorola's speculation as to the motivation behind the two nations' actions. The Court nonetheless acknowledges the United States' "vital interest in fully and fairly adjudicating matters before its courts, including the enforcement of its judgments." *NML Capital,* 2013 WL 491522, at *10. On balance, however, given the UAE's and Jordan's extensive regulatory framework regarding bank disclosures and their demonstrated interest in this case, it appears that Jordan and the UAE have a more significant interest in this dispute, and so this factor weighs against disclosure.

■ *Hardship of Compliance:* Courts take into consideration for this factor nonparty status, since "an order compelling production should be imposed on a nonparty ... only in extreme circumstances." *Linde,* 262 F.R.D. at 151. Here, although the Court is sympathetic to the lengths to which Motorola has been driven in its attempts to enforce its judgment, nonetheless, no "extreme circumstances" justify disclosure, and Standard Chartered has sufficiently demonstrated a meaningful risk that that it would face substantial criminal, civil, and regulatory penalties if compelled to produce the relevant documents. Therefore, this factor also counsels against disclosure. *Cf. Tiffany,* 276 F.R.D. at 158 (requiring that punishment for compliance must be more than speculative but need not be certain).

*Standard Chartered's Good Faith:* As to this final consideration, it is clear that Standard Chartered has cooperated with Motorola's requests in good faith, as it has provided, without objection, documents that raise no foreign conflict, has remained in contact with Motorola throughout this dispute, and, significantly, has frozen JDIB's assets in the UAE to prevent harm to Motorola before pressing its objections before this Court. Therefore, this consideration also weighs against imposing further disclosure obligations—and therefore further regulatory risk—on Standard Chartered's UAE branch.

In sum, only the specificity of Motorola's request (which however, is still quite broad, albeit no broader than the context requires) and the relative unavailability of alternative means of discovery favor disclosure. Since the vast majority of the comity factors weigh against compelling Standard Chartered to comply with Motorola's subpoena requests, the Court hereby denies Motorola's motion to the extent it would require Standard Chartered to produce to Motorola documents held in the UAE and Jordan, the disclosure of which would subject Standard Chartered to the risk of penalties under UAE and Jordanian law.

In reaching this decision, the Court does reject Motorola's claim that, by failing to object to the Injunction and Restraining Order within fourteen days after receiving it on February 15, 2013, *see* Fed.R.Civ.P. 45(c)(2)(B), Standard Chartered waived any objections to compliance with Motorola's subpoena requests. Although "[t]he failure to serve written objections to a subpoena within the time specified by Rule 45(c)(2)(B) typically constitutes a waiver of such objections," such failure may be forgiven "[i]n unusual circumstances and for good cause." *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 48 (S.D.N.Y.1996). Here, Standard Chartered produced various documents in response to Motorola's subpoenas within a reasonable time period and only raised its objections to the Court when it became concerned that compliance could cause it to suffer legal consequences abroad. Standard Chartered has remained in contact with Motorola throughout this time period, and, as a result,

Motorola has long been aware of Standard Chartered's concerns. Perhaps most significantly, in prior orders in this case, the Court has put the parties on notice that it would not address the risk of conflict with foreign laws in a hypothetical case; rather, it has instructed other banks that, should such entities "discover documents or information responsive to Motorola's request that would otherwise be prohibited from disclosure by foreign law, the parties should return to this Court to determine how best to proceed before disclosing that information to Motorola." Memorandum Order at 11, No. 02 Civ. 0666 (S.D.N.Y. June 6, 2013). Given these considerations, it would be inequitable to deem Standard Chartered's objections waived.

The Court has considered the parties' remaining arguments and finds that they do not merit further discussion given the Court's conclusions above. Accordingly, the Court denies Motorola's motion to compel compliance with its subpoena requests to the extent it would require Standard Chartered to produce documents in violation of UAE and Jordanian law, to include the production of additional documents relating to its interactions with JDIB (without JDIB's consent to disclosure) and communications with regulators in Jordan and the UAE. For the avoidance of doubt, Standard Chartered is obligated to comply with Motorola's requests for documents, including those located in other countries, that do not raise the concerns addressed herein.

SO ORDERED.