**MOTOROLA CREDIT CORPORATION and Nokia Corporation, Plaintiffs,**

v.

**Kemal UZAN, et al., Defendants.**

**No. 02–cv–666 (JSR).**

United States District Court, S.D. New York.

Signed Dec. 22, 2014.

Gordon M. Clay, John F. O'Connor, Steven K. Davidson, Steptoe & Johnson, L.L.P., Howard H. Stahl, Fried, Frank, Harris, Shriver & Jacobson, LLP, Washington, DC, Mishell B. Kneeland, Munsch Hardt Kopf & Harr, P.C., Austin, TX, Jason Brown, Ropes & Gray, LLP, Michael N. Donofrio, Neal N. Beaton, Holland & Knight, L.L.P., New York, NY, for Plaintiffs.

Kenneth M. Bialo, Emmet, Marvin & Martin, LLP, Mark Benjamin Holton, Robert F. Serio, Thomas C. Sheehan, Gibson, Dunn & Crutcher, LLP, New York, NY, for Defendants.

## OPINION AND ORDER

JED S. RAKOFF, District Judge.

On July 31, 2003, this Court awarded plaintiff Motorola Credit Solutions f/k/a Motorola Credit Corporation ("Motorola") damages in excess of $2 billion against defendants Kemal Uzan, Murat Hakan Uzan, Cem Cengiz Uzan, Melahat Uzan, Aysegul Akay, and Antonio Luna Betancourt (the "Uzans"), based on the Uzans' fraudulent diversion to their own purposes of loans of this magnitude made by Motorola to Telsim, a Turkish telecommunications company owned in large part by the Uzans. *See* Opinion and Order, 274 F.Supp.2d 481 (S.D.N.Y.2003). In June 2006, Motorola obtained an additional judgment of $1 billion in punitive damages. *See* Order, No. 02–cv–666, ECF No. 675 (S.D.N.Y. June 15, 2006). Motorola has been trying to collect its judgment ever since, but the Uzans—most of whom are fugitives from criminal indictments in Turkey brought as a result of a separate fraud—have evaded payment, not least by utilizing an international web of proxies and shells to hide their assets and evade payment. As a result, the Court, in November 2012, permitted Motorola to serve *ex parte* discovery requests on third parties to gather information about "Defendants' and/or their agents' assets or whereabouts." Order Regarding Service

of *Ex Parte* Discovery Requests, No. 02–cv–666 (S.D.N.Y. Nov. 19, 2012).

Based on the discovery thus obtained, as well as other evidence supplied by Motorola, the Court, on February 13, 2013, issued an injunction and restraining order, which (1) enjoined the Uzans, their agents, and anyone receiving notice of the Order from transferring or dissipating any Uzan assets until Motorola's judgment is paid in full; and (2) required any subpoenaed party in possession of property of the Uzans or their agents to immediately freeze and restrain access to such property. *See* Order Granting Injunctive Relief and Restraining Order ("Injunction and Restraining Order"), No. 02–cv–666 (S.D.N.Y. Feb. 13, 2013). Attached to the Injunction and Restraining Order was a list of "Uzan Proxies," defined as "entities or persons that serve as agents or instrumentalities of or are otherwise controlled, directly or indirectly, by the Uzans." *Id.* ¶ 10.

Beginning on February 14, 2013, Motorola served the Injunction and Restraining Order, along with subpoenas *duces tecum* permitted by the November 2012 discovery order, on the New York branches of a large number of domestic and international banks. In response, many of the banks challenged the applicability to their foreign branches of both the discovery order and the asset freezing order. The latter challenges were eventually resolved by the Court in an Opinion dated August 1, 2013, that held that New York's "separate-entity rule" precluded the turnover of Uzan assets held at foreign branches of banks whose New York branches had been served with the Injunction and Restraining Order. *See Motorola Credit Corp. v. Uzan*, 978 F.Supp.2d 205 (S.D.N.Y.2013). That decision, specifically involving assets held at a foreign branch of Standard Chartered Bank, was appealed to the Second Circuit, which certified the question of the vitality of the separate-entity rule to the New York Court of Appeals. On October 23, 2014, the New York Court of Appeals held that the separate-entity rule remains intact. *Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149, 163 (N.Y. 2014). Accordingly, on November 14, 2014, the Second Circuit, adopting that ruling, affirmed this Court's August 1, 2013 Opinion and directed that this Court lift any remaining attachments of assets of Standard Chartered. *Motorola Credit Corp. v. Standard Chartered Bank*, 771 F.3d 160 (2d Cir.2014). On December 5, 2014, the Second Circuit mandate issued and was duly docketed. No. 02–cv–666, ECF No. 1046 (S.D.N.Y. Dec. 5, 2014).

Although the mandate technically applies only to Standard Chartered, the reasoning of the foregoing decisions of the New York Court of Appeals and the Second Circuit clearly governs all similarly situated banks, and accordingly, the Court hereby lifts any remaining attachment of any Uzan assets held by a foreign branch of a bank whose New York branch was served with the February 2013 attachment order where no other basis for the attachment exists.

This, however, does not moot the November 2012 discovery order, since Motorola still has a significant interest in finding out in what foreign branches of the subpoenaed banks the Uzans are holding funds, so that it may then seek to obtain such funds through proceedings in the relevant countries. Here again Standard Chartered has taken the lead in litigating the reach of the discovery order, and on August 12, 2013, the Court held, on grounds of international comity, that Standard Chartered need not produce documents responsive to the subpoena that were held by Standard Chartered branches in Jordan and the United Arab Emirates ("UAE"). *See* Memorandum Order, *Motorola v. Uzan*, 293 F.R.D. 595

(S.D.N.Y.2013). Motorola then moved for reconsideration of that Memorandum Order.

Independently, numerous other banks challenged the discovery order as applied to some or all of their foreign branches, and Motorola, for its part, made several motions to compel compliance with the discovery order. Some of these motions have been dealt with preliminarily, *see, e.g., Motorola v. Uzan*, No. 02–cv–666, 2013 WL 6098388 (S.D.N.Y. Nov. 20, 2013) (redacted Opinion and Order directing a bank to search its subsidiaries in compliance with such a subpoena); Redacted Memorandum Order, No. 02–cv–666, ECF No. 899 (Dec. 16, 2013) (ordering a bank to conduct a search to determine whether there is a "true" and not "hypothetical" foreign-law conflict), but the Court now undertakes, in this Opinion and Order, to deal with these discovery matters more globally by laying out certain basic principles and considerations that can then be applied to each particular motion (some of which are resolved here).[1]

The primary question here presented—whether a New York judgment creditor, through subpoenas issued on New York offices of international banks, can obtain discovery regarding accounts held by the judgment debtors or their agents in various foreign branches of these banks—is hardly a new one, and has often turned on whether the foreign laws governing the foreign branches prohibit such discovery and, if so, whether such foreign laws should be given deference here. More often than not, such deference has not been accorded. *See, e.g., Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir.1992) (affirming order of production notwithstanding Chinese secrecy laws); *Strauss v. Credit Lyonnais*, 249

F.R.D. 429, 438 (E.D.N.Y.2008) (refusing protective order sought on basis of French bank secrecy law); *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, No. 90–cv–2370, 2000 WL 713057 (S.D.N.Y. June 2, 2000) (declining to defer to Mexican bank secrecy law); *Alfadda v. Fenn*, 149 F.R.D. 28 (S.D.N.Y.1993) (denying protective order sought on the ground of Swiss bank secrecy); *United States v. Chase Manhattan Bank, N.A.*, 584 F.Supp. 1080 (S.D.N.Y.1984) (refusing protective order sought on basis of Hong Kong bank secrecy law). *See also NML Capital, Ltd. v. Republic of Argentina*, No. 03–CV–8845, 2013 WL 491522 (S.D.N.Y. Feb. 8, 2013) (expressing frustration with objecting party's belated foreign-law objections and ordering production notwithstanding asserted conflicts with Spanish data protection laws, Brazilian bank secrecy laws, a Bolivian sovereignty statute, the Chilean bank secrecy law, the Panamanian Constitution and other laws, the Paraguayan Constitution and other laws, the common law in the Cayman Islands, Argentina's bank secrecy law, and Uruguayan bank secrecy law).

All these cases, however, recognize the primacy in this area of law of the Supreme Court's decision in *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987). There, the Supreme Court held that the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, to which the United States is a signatory (codified at 28 U.S.C. §§ 1781–1785), did *not* provide the exclusive or mandatory procedure for obtaining documents located abroad, did *not* require first resort to the Hague Convention, and did *not* deprive a district court of its power

---

**1.** Because these motions were briefed under seal, this non-sealed Opinion and Order necessarily speaks somewhat in generalities and omits citations to some of the details set forth in the parties' papers and affidavits accompanying them.

to order those subject to its jurisdiction to produce documents located abroad. Nevertheless, such document requests had to be decided with full consideration of international comity, which "requires in this context a more particularized analysis of the respective interests of the foreign nation and the requesting nation...." *Aerospatiale*, 482 U.S. at 543–44, 107 S.Ct. 2542.

■ More specifically, the Supreme Court, drawing on the Restatement (Third) of the Foreign Relations Law of the United States (Tentative Draft No. 7, 1986), identified five factors relevant to deciding such applications: "(1) the importance to the ... litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." *Id.* at 544 n. 28, 107 S.Ct. 2542 (ellipsis in original).[2]

Most of the *Aerospatiale* factors apply identically to all the motions here under consideration. As to the second *Aerospatiale* factor, involving the degree of specificity of the request, the subpoenas are all substantially identical. Furthermore, this Court has already determined that "Moto-

rola's subpoena requests are as narrowly tailored as reasonably possible given the Uzans' diverse, complex, and concerted efforts to conceal their assets from their creditors, and, in this context, the requests are not excessively overbroad or burdensome." *Motorola*, 293 F.R.D. at 599–600. As to the third *Aerospatiale* factor, the documents in question all originated abroad, *see id.* at 600—although "this factor is not determinative." *NML Capital*, 2013 WL 491522, at \*10.

The first *Aerospatiale* factor, the importance to the litigation of the documents requested, is also identical across the motions, but varies somewhat with the particular request. In this regard, moreover, the Court, on Motorola's motion for reconsideration, partially modifies its prior determination that the documents have only modest value. That determination rested on the fact, since reconfirmed, that any Uzan funds identified as being held in a foreign branch of a subpoenaed bank cannot be here attached given the separate-entity rule. *Motorola*, 293 F.R.D. at 599. However, the Court is now satisfied that Motorola cannot realistically seek attachment of these funds in lawsuits commenced in the relevant nations unless it first learns where the funds are located, such as by the discovery here sought. Furthermore, the fact that the laws of some countries may place obstacles in the

---

2. A Southern District decision contemporary with *Aerospatiale*—*Minpeco, S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. 517 (S.D.N.Y.1987)—cited a similar list of factors drawn from the Restatement (Second) of the Foreign Relations Law of the United States (1965) for resolving conflicts of law not specific to document production: "(a) vital national interests of each of the states, (b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person, (c) the extent to which the required conduct is to take place in the territory of the other state, (d) the nationality

of the person, and (e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state." *Minpeco*, 116 F.R.D. at 522. The first two factors, the *Minpeco* Court found, had always been by far the most important, but Courts had also considered for discovery, in addition, "the importance of the information and documents requested to the conduct of the litigation" and "the good or bad faith of the party resisting discovery." *Id.* As it happens, in the motions here at issue, the *Aerospatiale* and *Minpeco* factors effectively apply in identical fashion.

path of Motorola's attempts to domesticate its judgment in those countries does not mean that the documents will not tell Motorola where to try.

Accordingly, the importance of the documents, as a general matter, is somewhat higher than the Court previously indicated. Their importance does vary, however, based on how crucial a particular set of requested documents is to assisting in locating the hidden funds. For example, a request for information about a bank's communications about the Injunction and Restraining Order with persons other than the Uzans is less important than a request for information about the Uzans' or their agents' accounts or their own communications.

As to the fourth *Aerospatiale* factor— "the availability of alternative means of securing the information"—none of the banks here involved has shown to the Court's satisfaction that Motorola is as likely to obtain information regarding the Uzans' concealed funds, either through resort to the Hague Convention or by means of proceedings brought in the countries with which these motions are primarily concerned, as it is in the proceedings here pending. With respect to proceedings brought directly in such countries, this is because most of these countries have blocking statutes that prohibit their courts from releasing this information. Although, as discussed below in connection with the fifth factor, some of these countries will acquiesce in banks' complying with orders of U.S. courts to release such information, none is prepared to affirmatively order banks in their jurisdictions to provide such information. As for the Hague Convention, there are substantial questions as to whether the instant applications fall within the scope of that treaty, and litigation of that issue, even if ultimately resolved favorably to Motorola, would occasion substantial delays. Moreover, it is doubtful

whether the Hague Convention proceedings could be kept confidential from the Uzans, without which such proceedings would be pointless, since the Uzans could simply move their monies to new accounts in the names of new proxies in new jurisdictions. Finally, it appears doubtful that courts of these countries would treat the Hague Convention as overriding their own blocking statutes.

However, while the four factors canvassed above generally favor Motorola's applications, it must not be forgotten that what we are concerned with here is a comity analysis, and from that standpoint the most important factor is the fifth factor: "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." Here, there is an obviously strong U.S. interest in enforcing the final judgment of a federal court, even if the judgment is designed to protect the property rights of a private party. On the other hand, several of the nations whose laws are here involved have enacted legislation prohibiting the release of some or all of the information here sought, sometimes on pain of criminal prosecution, thereby suggesting a strong competing interest. But is this for real? If a given country truly values its national policy of, say, criminalizing compliance with a U.S. court subpoena, it will prosecute its citizens for so complying. More generally, whether the prohibition against disclosure be civil or criminal in nature, the extent to which the relevant country has actually enforced the prohibition is a strong indicator of the strength of the state interest.

Regrettably, the expert opinions that accompany the parties' motion papers in each of these motions provide in most cases little hard or detailed information as

to the degree to which various nations here involved actually enforce their prohibitions against disclosure. Despite this limitation, however, the Court, on the basis of the materials here provided, reaches the following conclusions with respect to several of the nations here involved, namely, France, Switzerland, Jordan, and the UAE:

■ *France.* France, like many other civil law and some common law countries, has enacted a so-called "blocking statute," Law No. 80–538 of July 16, 1980, which provides in Article 1 *bis* that "no person may ... transmit, in writing, orally, or in any other form, documents or information of economic, commercial, industrial, financial, or technical nature, intended for the constitution of evidence in connection with pending or prospective foreign judicial or administrative proceedings." Article 3 of that law authorizes not only fines but up to six months' imprisonment for violations of Article 1 *bis.* On its face, then, the French blocking statute would prohibit not just a bank but anyone in France from complying with U.S. court-ordered discovery, on pain of imprisonment. "Article One is explicitly intended to protect the 'sovereignty, security, and vital economic interests' of France." *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 30 (S.D.N.Y.1984). Its language is mandatory, it speaks specifically to the conduct contemplated by an order compelling production (although not specifically to banks), and it even invokes "vital" interests like security and sovereignty as its fountainhead (although not an interest as specific as consumer privacy or confidence in the banking system).

■ But, as the Supreme Court stated in discussing the French blocking statute in *Aerospatiale,* "American courts are not required to adhere blindly to the directions of such a statute." *Aerospatiale,* 482 U.S.

at 544 n. 29, 107 S.Ct. 2542; and, as it turns out, "[i]t is inconceivable that Law No. 80–538 is to be taken at face value as a blanket criminal prohibition against exporting evidence for use in foreign tribunals." *Adidas (Canada) Ltd. v. SS Seatrain Bennington,* No. 80–CV–1911, 1984 WL 423, at *4 (S.D.N.Y. May 30, 1984). In actuality, the law is riddled with loopholes that make it substantially unenforceable. This was no accident:

[The relevant] report to the French National Assembly recommended the law's adoption on the ground that it would offer French nationals "a legal excuse for refusing to supply the information and documents demanded of them [and] a judicial weapon which will at least make it possible for them to gain time. The conflict thus created will block matters for a time and will make it possible to raise the conflict to a governmental level." With respect to the potential penalties, the report noted that "it is necessary not to misunderstand the actual scope of these penalties ... [because] these penalties are applied only on the improbable assumption that the companies would refuse to make use of the protective provisions offered to them. In all other cases, these potential fines will assure foreign judges of the judicial basis for the legal excuse which companies will not fail to make use of."

*Id.* at *4 n. 4 (internal citation omitted).

In practice, as a result, it appears that when a foreign court orders production of French documents even though the producing party has raised the "excuse" of the French blocking statute, the French authorities do not, in fact, prosecute or otherwise punish the producing party. Accordingly, the French interests considered as part of the fifth *Aerospatiale* factor are not enough to override the U.S. interest in enforcing its judgments, let alone the other

factors favoring Motorola's position. Therefore, the Court hereby orders compliance with the subpoenas so far as documents located in France are concerned.

■ *Switzerland.* In contrast with the French situation, Switzerland's bank secrecy regime constitutes, not just a seriously enforced national interest, but almost an element of that nation's national identity. Article 47 of the Swiss Banking Act, enacted 80 years ago, provides, in relevant part:

> Whoever intentionally discloses secret information confided to him in his capacity as officer, employee, agent, or liquidator of a bank, as officer or employee of an auditing firm, or if he has acquired knowledge in such a capacity, attempts to induce another person to violate the professional secrecy shall be punished with imprisonment up to three years or monetary penalty. If the act has been committed by negligence, then the penalty shall be a fine of up to 250,000 Swiss Francs. In case of a repetition of such act within five years following the final sentence, the fine shall be a minimum of 45 daily income units. The breach of professional secrecy remains punishable after termination of the public or private employment relationship or practice of the profession.

In addition to the sweeping and mandatory language that is directly on point to a contemplated order to compel disclosure of customer information held by a bank, a violation of Article 47 is prosecuted *ex officio* even if the injured party does not complain, which shows that this policy is not merely protective of private interests but expressive of a public interest. And

that interest is definitely enforced. The Swiss Federal Office for Statistics reports 28 prosecutions between 1987 and 1996, and although that number has not been recently updated, anecdotal evidence presented to the Court indicates ongoing, vigorous, and serious enforcement, as in a three-year prison sentence in 2013 for a former employee of Bank Julius Baer who aided German tax collectors. Although some outsiders have suggested that the strong Swiss policy against disclosure simply reflects an effort to help the Swiss banking industry prosper by providing a protected haven for tax evaders, Switzerland's recent cooperation with U.S. authorities in pursuing such tax evasion suggests that, on the contrary, Switzerland regards bank secrecy as a positive social value and benefit, to be used but not abused.[3] In such circumstances, a balancing of interests strongly favors denying the release of the subpoenaed information from bank branches located in Switzerland, and the other *Aerospatiale* factors do not overcome this conclusion. Accordingly, the Court quashes the subpoenas to the extent they seek documents located in Switzerland.

■ *Jordan and the UAE.* When the Court issued its August 12, 2013 Memorandum Order finding that the international comity analysis weighed against ordering Standard Chartered to comply with Motorola's subpoena so far as documents located in Jordan and the UAE were concerned, it did so on the basis of Standard Chartered's experts' opinions on Jordanian and UAE law, but without the benefit of any Motorola experts. In its motion for reconsideration, however, Motorola has

---

**3.** Although the Court finds Article 47 of the Swiss Banking Act worthy of substantial deference, the Court rejects the banks' argument that similar deference is due to Article 271 of the Swiss Penal Code, which speaks only tangentially to the production of documents and,

according to the Swiss Federal Department of Justice and Police, does not create criminal liability for a bank that adheres to a U.S. court's order to search for bank account documents located in Swiss bank branches.

submitted expert declarations to rebut those of Standard Chartered. Upon review, the Court concludes that, even though the Court previously found that "Standard Chartered has sufficiently demonstrated a meaningful risk that that it would face substantial criminal, civil, and regulatory penalties if compelled to produce the relevant documents," 293 F.R.D. at 600, that conclusion must now be modified, if not abandoned. For one thing, the Court has now been apprised that Article 72 of the Jordanian Banking Law permits disclosure of bank account information if so-ordered by a "competent judicial authority," and there is no material indication that this is limited to the courts of Jordan. *See NML Capital*, 2013 WL 491522, at *4–*9 (ordering compliance because objecting party failed to adduce evidence showing that similar exceptions of various foreign sovereigns would apply only to domestic courts and not to U.S. courts). More importantly, the Court's attention has now been focused on the total paucity of published prosecutions of banks or their officers in Jordan and the UAE for complying with discovery ordered by a foreign court. Nor have the objecting banks identified any such prosecutions, published or otherwise. Accordingly, the Court reverses its prior order and orders compliance by Standard Chartered with requests for bank information located in Jordan and the UAE. The same applies to other banks who have objected to such production from those countries.

Based on the foregoing, the parties, jointly or severally, are hereby directed to submit to the Court by January 9, 2015, proposed orders resolving the pending motions to the extent determined by the foregoing findings and conclusions. In addition, each bank whose objections to production are not resolved by such orders should file with the Court by January 30, 2015, written briefs (not to exceed ten double-spaced pages) and, if necessary, accompanying affidavits, suggesting how the foregoing principles should be applied to documents located in countries other than France, Switzerland, Jordan, or the UAE that have blocking statutes on which the objecting banks have relied. Motorola may then respond by filing a single brief of no more than 30 double-spaced pages, plus accompanying affidavits if necessary, by February 21, 2015.

SO ORDERED.